## Commonwealth v. Temple Coal Company et al.

8

*Robert E. Scragg*, for Commonwealth.
*Willard M. Henkelman*, for the Temple Coal Co.
*Edward M. Murphy*, for Consagra Coal Mining Co.
*James J. Ligi*, for Ace Coal Co.

HOBAN, P. J., December 5, 1949.—The pleadings consist of a bill in equity brought initially against the Temple Coal Company and Consagra Coal Mining Company as original defendants, to enforce an order of the Water and Power Resources Board directing

defendants to provide certain installations in Hull's Creek, in the Borough of Blakely, this county, to prevent ensilting of the creek from culm banks through which it passes, thus removing a perennial flood menace. Each of the defendants filed responsive answers and Consagra Coal Mining Company filed its petition to join Ace Coal Company as a defendant, on the ground that Ace Coal Company had acquired by purchase from Consagra certain land, the drainage from which contributed to the condition complained of, and that Ace Coal Company, therefore, was at least jointly responsible with Consagra Coal Company for the erection of the installation. The court thereupon ordered Ace Coal Company joined as an additional defendant.

Ace Coal Company filed responsive answers both to the petition and to the original bill in equity, the gist of which was that Ace Coal Company denied any responsibility for the creation of the condition in question and averred that it had been forced by Consagra Coal Mining Company to purchase the land adjoining Hull's Creek during the pendency of the proceedings against Consagra Coal Company by the Water and Power Resources Board without being informed by Consagra or anyone else that such proceedings were pending; that it had no use for the land in question; that it was forced to purchase it from Consagra only because Consagra refused to grant a right of way for ingress and egress to other properties of Ace Coal Company over certain other lands owned by Consagra, all unrelated to the Hull's Creek situation, or the granting of the right of way would be withheld from Ace. The original bill was amended by consent of all the parties to correct the description of the land in question, averred to be owned or leased by original defendants. By another agreement of the parties it was stated of record that the order of the Water and Power Resources Board having been complied with, the bill

10

might be dismissed as against the Temple Coal Company, which had divested itself of its interest in the property.

As it stands, therefore, the interest of plaintiff is to secure a decree against the appropriate party providing for the maintenance of a settling basin so as effectively to intercept flood wash and debris and prevent damage from such sources along the lower reaches of Hull's Creek. The issue as between Consagra Coal Mining Company and Ace Coal Company is as to whether or not Consagra has a right to be reimbursed for the proportionate share of the expenses it incurred in erecting the dam and the construction of the settling basin, and to require Ace Coal Mining Company to share in the future maintenance of this device.

The case came on to be heard on bill, answer, the stipulations and oral and documentary testimony, before Hoban, P. J., as chancellor.

From the pleadings and the evidence we make the following

### Findings of Fact

1. Prior to July 1, 1947, defendant Temple Coal Company was the owner of a two-thirds interest in, and defendant Consagra Coal Mining Company was the lessee of, several tracts of land in Blakely Borough, this county, designated for convenience as follows: Second Street plot, containing 1.79 acres; Lincoln Street plot, containing 2.10 acres, and Winton plot, containing 125.55 acres.

The Second Street plot and the Lincoln Street plot are adjoining but both are distant from the nearest side of the Winton plot by 750 feet or more.

Hull's Creek, a stream of water, runs generally south diagonally across the southeasterly half of the Winton tract, and through large refuse culm piles or dumps which were deposited on the land by predeces-

sors in title of Temple Coal Company, Consagra Coal Mining Company and Ace Coal Company.

2. In May 1947 as a result of severe flood conditions in Blakely Borough, the Water Power and Resources Board concluded that the erosion of debris and other materials from the culm piles in the Winton plot created an objectionable obstruction in Hull's Creek, and in June 1947, after due written notice, instituted proceedings to compel Temple Coal Company to take appropriate action to eliminate the obstruction. Such action was taken under authority of the Act of June 25, 1913, P. L. 555, as amended by the Act of May 6, 1937, P. L. 559, 32 PS §681-690.

3. Prior to July 1, 1947, and at all times subsequently Ace Coal Company maintained a breaker or coal preparation plant on property adjacent to the Second Street and Lincoln Street plots. Temple Coal Company had granted to Ace Coal Company by parol agreement a right of way over the Second Street and Lincoln Street plots and through the Winton plot to Hull's Creek. Through these properties Ace Coal Company maintained a water pipe line to draw water from Hull's Creek for use in its breaker. For this right of way Ace Coal Company paid Temple Coal Company $35 per month.

4. On July 1, 1947, Temple Coal Company sold and by appropriate deed conveyed to Consagra Coal Mining Company its two-thirds undivided interest in the plots designated as in finding 1. Temple Coal Company thereupon notified Ace Coal Company to deal with Consagra Coal Mining Company with reference to future use of the right of way referred to in finding 3.

5. Subsequent to July 1, 1947, plaintiff was notified of the sale of the interest of Temple Coal Company to Consagra Coal Mining Company, and Consagra Coal Mining Company acknowledged to plaintiff its familiarity with prior instructions from plaintiff to Temple

Coal Company. Thereafter plaintiff dealt solely with Consagra Coal Mining Company to eliminate the Hull's Creek water obstruction. Various letters were exchanged and conferences had between plaintiff and Consagra Coal Mining Company and instructions issued by plaintiff during the months of August, September, October and December 1947.

6. After July 1, 1947, Ace Coal Company paid Consagra Coal Mining Company $45 for one month's use of the right of way.

7. Thereafter Consagra Coal refused to grant a right of way to Ace Coal Company for such sums and offered a right of way over the Lincoln Street plot provided Ace Coal Company purchased the Second Street plot and so much of the Winton plot as lay East of Hull's Creek, 28.5 acres in extent.

8. Ace Coal Company agreed to purchase the Second Street plot, the 28.5-acre piece of the Winton plot and the right of way over the Lincoln Street plot and $3,400 was agreed as the price.

9. On August 25, 1947, officials of Ace Coal Company went to Consagra Coal Mining Company to close the deal and, learning for the first time that Consagra Coal proposed to convey only a two-thirds interest in the properties, refused to pay over the $3,400 and asked for more time to consider the situation.

10. Louis Consagra, president of Consagra Coal Mining Company, on being apprised of Ace Coal Company's request for delay, refused to grant any further delay, revoked the offer of sale at $3,400 and instructed his attorney-at-law to demand $5,000 for the properties.

11. On September 12, 1947, Joseph R. Murphy, as attorney for Consagra Coal Mining Company, wrote and forwarded to Ace Coal Company the following letter:

"MURPHY & SWOYER
ATTORNEYS AT LAW
SUITE 207-208 CONNELL BUILDING
SCRANTON 3, PENNSYLVANIA

"September 12, 1947

"Ace Coal Company
300 Main Street
Blakely, Pennsylvania

"Gentlemen:

"I am writing as attorney for Consagra Coal Mining Company, with reference to a letter dated August 28, 1944, from Temple Coal Company to Ace Coal Company, authorizing the use of certain lands in the Borough of Blakely.

"Kindly be advised that sixty days from the date of this letter said authorization is cancelled, and all oral contracts by and between Consagra Coal Mining Company and Ace Coal Company are cancelled effective this date.

"We also wish to inform you that from the first day of October, 1947, a rental of $300.00 will be due from the Ace Coal Company to the Consagra Coal Mining Company for use of said lands in the Borough of Blakely, County of Lackawanna, Pennsylvania.

"Very truly yours,

MURPHY & SWOYER
(Signed) JOSEPH P. MURPHY
By: JOSEPH P. MURPHY,
Attorney."

12. Only one conference was had between Louis Consagra, president of Consagra Coal Mining Company, and Rigo Bevilacqua, president, and Louis Simoncelli, vice-president of Ace Coal Company, concerning the purchase of lands and right of way and that was prior to August 25, 1947. Thereafter nego-

tiations were conducted by the respective attorneys-at-law for the parties.

13. On October 31, 1947, Consagra Coal Mining Company sold and by appropriate deed conveyed to Ace Coal Company a two-thirds undivided interest in the Second Street plot and in the 28.5 acres section of the Winton plot lying east of and abutting the east bank of Hull's Creek, and the right to use in common with Consagra Coal Mining Company and other tenants in common for the purpose of ingress, egress and regress, the surface only of the Lincoln Street plot. The consideration was $5,000.

14. The use of the Second Street plot and the right of way over the Lincoln Street plot is essential to the operation of Ace Coal Company's breaker. The use of the 28.5-acre piece of the Winton plot, except for the passage of the water pipe line to Hull's Creek, is not only non-essential but useless to the business of Ace Coal Company. The water pipe line is intermittently useful but not essential to Ace Coal Company.

15. On December 18, 1947, after various conferences with representatives of Consagra Coal Mining Company, the Water Power and Resources Board issued its amended and final order, as follows:

"Amended Order:

"That the Consagra Coal Mining Company shall provide a settling basin upstream from the Fourth Street Bridge, in Blakely Borough, Lackawanna County, in accordance with plan titled 'Consagra Coal Company Plan of Proposed Debris Dam on Hulls Creek North of 4th Street in Blakely Borough' dated October 18th, 1947, as revised and filed in the office of the Water and Power Resources Board on December 3rd, 1947.

"That the Consagra Coal Mining Company shall proceed forthwith to construct the aforesaid settling basin in accordance with the approved plan.

"That the Consagra Coal Mining Company shall maintain the aforesaid settling basin so as to effec-

tively intercept flood wash and debris in the aforesaid settling basin.

"That within thirty (30) days from the date of this order, the Consagra Coal Mining Company shall deposit this order for record in the Office of the Recorder of Deeds in Lackawanna County and shall furnish this Board with the recording reference.

"Very truly yours,

"WATER AND POWER RESOURCES BOARD
"(Sgd) M. F. DRAEMEL, Chairman.

"Attest:

"(Sgd) W. E. KIRKPATRICK, Secretary.
"WEK/mm."

16. On March 3, 1948, Consagra Coal Mining Company agreed to begin work according to the approved plan, just as soon as weather permitted.

17. To September 8, 1948, the date of filing the bill in equity, Consagra Coal Mining Company had not commenced work on the Hull's Creek project.

18. On September 12, 1948, Consagra Coal Mining Company commenced the work as prescribed by the board in its order of December 18, 1947, and completed the construction of the settling basin during September 1948. The construction cost Consagra Coal Mining Company $2,099.32.

19. At no stage in these proceedings did the Water and Power Resources Board communicate with or issue any instructions to Ace Coal Company. Nor did Ace Coal Company participate in the planning or construction of the works required by the board or contribute to the cost of completing such work.

20. The settling basin is an area where silt and debris will be impounded behind a dam approximately 90 feet wide. About 47 feet of this construction was made on land east of the east bank of Hull's Creek, that is, on the 28.5-acre piece of the Winton plot owned by the Ace Coal Company. The stream bed is 18 feet

wide at the breast of the dam and about 25 feet of the dam is constructed on the west bank or Consagra land. The steeper slope of the west bank accounts for this footage distribution.

21. It would be impracticable or impossible to construct separate units on either Consagra or Ace land to accomplish the result ordered by the Water and Power Resources Board.

## Discussion

If there is any jurisdiction in the Water and Power Resources Board to demand the action which it here seeks to impose upon the Consagra Coal Mining Company, it must be found in the statement of facts set forth in its bill and the powers granted to it by section 5 of the Act of June 25, 1913, P. L. 555, as amended. The facts upon which the board seeks to invoke the equity powers of the court are set forth in the bill in paragraphs 7, 8 and 11. Paragraph 7 states as follows:

"That the said refuse culm piles or dumps through erosion of material create an objectionable obstruction in said Hull's Creek contrary to the Act of Assembly, etc."

This is obviously a conclusion of law, if anything. The answers of both Temple Coal Company and Consagra Coal Mining Company challenge this statement as a conclusion. It is obvious that the statement is just that. No evidence was presented at any time to show that any obstruction was placed in the stream by Temple Coal Company, Consagra Coal Mining Company or Ace Coal Company.

Paragraph 8 of the bill states that in May 1947 severe flood conditions existed in Blakely Borough and that complaints were made to the board with respect to the obstruction in the stream occasioned thereby, whereupon the board made an investigation of "the said water obstruction". Thereafter, by written notice

the board directed the parties in interest "to consider why an order should not be made to stabilize the said refuse piles and prevent material entering Hull's Creek".

Paragraph 11 of the bill states that further complaints with respect to the refuse dump causing, through erosion, an objectionable obstruction having been made to the board, the board caused a further investigation to be made and thereafter made an order directing the Temple Coal Company and/or Consagra Coal Mining Company to construct a satisfactory protection to stabilize the refuse dump adjacent to Hull's Creek, to prevent erosion of the material.

The chancellor is unable to find any language in the Act of 1913, as amended by the Act of May 6, 1937, P. L. 559, to justify the conclusion that an accumulation of flood debris finding its way into the stream bed by erosion from the banks is a water obstruction as defined in the act. Apparently the legislature must have had some such theory in mind when it passed the Act of June 5, 1947, P. L. 422, authorizing the Department of Forests and Waters to remove flood waste, deposits, flood water obstructions, gravel, bars and debris from any river or stream and to restore or rectify flood damaged or destroyed stream channels. There is no suggestion in the Act of 1947 that riparian owners are responsible for removing flood debris from stream channels.

Section 2 of the Act of 1913, as amended, makes it an unlawful act for persons, associations or municipalities to construct a dam or other water obstruction, or to make or construct a change therein or addition thereto, or in any way to change or diminish the course, current or cross section of any stream without appropriate permit from the board.

In section 5 of the act, as amended, we find the statement of legislative intent:

"That the provisions of this Act shall extend to and include all types of water obstructions, regardless of the date when they were constructed, and whether or not the same were constructed by permission, express or implied, of the Commonwealth . . . and to all changes in the course, current or cross section of any stream. . . ."

It is apparent all through the act that "water obstruction" as used therein refers to some type of structure placed within the stream, whether deliberately or negligently, but at least artificially, and the chancellor cannot read into the act any requirement that a riparian owner may be compelled to remove flood debris which was caused by the erosion of material from the banks into the stream, whether that material consisted of ordinary earth or of any material placed on the riparian owner's land.

However that may be, it seems to have been conceded during the course of the negotiations that Consagra Coal Mining Company was obligated to perform some work upon the land to prevent obstruction occurring by reason of flood debris or the erosion of materials from the land. As a result of their negotiations with the board, the amended order, cited in finding no. 15, was issued by the board. This order imposed a definite requirement on Consagra Coal Mining Company to erect a structure in the stream bed. If the board had any power to make such an order, it must be found in this language from section 5 of the Act of 1913, as amended, 32 PS §685:

"If the board shall determine that such dam or water obstruction is unsafe or needs repair, alteration or change in its structure or location, or should be removed as being unsafe and not susceptible of repair, or for any reason is derogatory to the regimen of the stream, the board shall, in writing, notify the owner or owners thereof to repair, alter, change its structure

or location, or remove the same, as the exigencies of the case may require."

Where in the quoted language can be found any power to direct a riparian owner to construct any work in any stream, or for that matter to construct any work upon the riparian owner's land? What the language does authorize the board to do is to compel the owner of an obstruction to repair it, alter it, change its structure or location or remove it. This language again indicates the clear intent of the act to be concerned only with artificial structures placed in the stream without appropriate permission or contrary to the interests of the public. If by any stretch of imagination the language of this section could include adjoining riparian land holders as the owners of the flood debris accumulated in a stream channel, the most that the board could do would be to direct the owners to remove the debris. In view of the clear and unequivocal designation of authority to the Department of Forests and Waters to dredge and remove flood waste, debris, etc., granted in the Act of 1947, it may be seriously doubted whether any such idea was contemplated by the legislature in the Acts of 1913 and 1937.

If the foregoing observations are valid, the board, therefore, cannot seek the aid of a court of equity to enforce an order which it had no power to make in the first place, and the position of Consagra Coal Mining Company in subsequent establishment of the settling basin and construction of the dam must be considered as that of a volunteer. Certainly no liability could be placed on Ace Coal Company to contribute to the cost of a structure which the Water and Power Resources Board had no right to demand to be constructed by Consagra Coal Mining Company, no matter how desirable a solution to the flood debris situation such construction may have been. The chancellor can be concerned only with the enforcement of orders which the

board is empowered to make and not with the application of remedies which the citizen is not compelled to provide.

The theory upon which Consagra Coal Mining Company sought to impose liability for contribution on Ace Coal Company as expressed in its petition to join Ace Coal Company as a defendant, was that Consagra and Ace have a community of interest in the subject-matter, because the injury, if any, to the stream bed was caused by the wrongful acts of both Consagra Coal Mining Company and Ace Coal Company in maintaining refuse piles on their respective properties from which debris was eroded into the stream channel. If that should be a valid reason for contribution, there is no evidence to support the assumption of fact, at least as to Ace Mining Company. There is neither pleading nor proof that at any time after Ace Coal Company acquired its two-thirds undivided interest in the 28.5-acre piece of the Winton plot, any debris eroded from its property into the stream bed and created a water obstruction. If this theory of contribution is the sole ground for imposing liability on Ace Coal Company, it must fail for want of factual proof.

While not pleaded, at the trial Consagra Coal Mining Company advanced two other reasons for demanding contribution from Ace Coal Company; (1) That during the course of negotiations leading up to the purchase by Ace of the two-thirds interest in the property set forth in the findings of fact, Ace Coal Company had agreed with Consagra Coal Mining Company to pay half of the cost of erecting the dam and settling basin, and (2) that for Consagra Coal Mining Company to bear the entire cost would be to cause the unjust enrichment of Ace Coal Company.

There is conflicting evidence as to whether the proper officials of Ace Coal Company knew of the proceedings and negotiations between the Water and Power Re-

sources Board and Consagra Coal Mining Company prior to the purchase of the property by Ace Coal Company. Thus the Consagra Coal Mining Company asks the chancellor to find that Ace Coal Company had agreed to assume half the cost of construction and the Ace Coal Company asks the chancellor to find as facts that it was never informed by the Consagra Company that the board had ordered the construction of the settling basin and that it, Ace Coal Company, never agreed to pay any part of the cost of construction. There certainly is color in the testimony of Mr. Louis Consagra, president of Consagra Coal Company, to warrant the finding that the subject at least had been discussed prior to the property purchase by Ace Coal Company. However, from Mr. Consagra's testimony it is quite clear that only one meeting occurred by the responsible parties to the property deal and that was prior to August 25, 1947. If any such discussions took place at that time, or any oral agreement was made as to the cost of construction, such agreement was effectively cancelled by the rescission of the offer to sell and the cancellation of all oral undertakings between the parties as of September 12, 1947. See the formal letter from Murphy & Swoyer, attorneys, to Ace Coal Company, dated September 12, 1947, set out in finding no. 11. There is no evidence that subsequent to that time any meeting between the officers of the respective companies took place. In fact, according to Mr. Consagra, all subsequent negotiations were conducted entirely through the attorneys-at-law, and there is utterly no evidence that any new agreement with reference to the cost of construction was entered into by the parties.

The claim for the contribution on the theory of restitution can only be based on the principle expressed in A. L. I. Restatement of the Law of Restitution §76, to wit:

"A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct."

As we have observed above, the chancellor is not convinced that Consagra Coal Company was under any legal duty to provide the construction as ordered by the board, and while obviously consenting to comply with the order, its consent cannot impose any legal duty on another riparian owner. Hence, in providing so much of the construction as extends into the Ace Coal Company land, we are not warranted in making the assumption that the Ace Coal Company should have constructed any part of this work as a matter of legal duty, and hence is not required to indemnify the Consagra Coal Mining Company for performing the alleged duty for it. The Ace Coal Company insists that the conduct of the Consagra Coal Mining Company was wrongful in forcing the Ace Company to purchase unwanted land for an outrageous price, under penalty of refusing the right of way over comparatively worthless property. As a strict matter of law, perhaps the commercial ethics of Consagra in this deal cannot be questioned, but certainly its conduct would not induce a chancellor to grant Consagra further relief as a matter of conscience. Nor can we see in what respect the Ace Coal Company has been enriched, unjustly or otherwise, by the construction of the dam. If this construction does anything to Ace Coal Company, it imposes an obligation and a continuing expense on it if the Commonwealth's theory of future maintenance is to be upheld, without any corresponding return in advantage to the land or to the Ace Coal Company operations. The theory of unjust enrichment falls for lack of factual support.

Since the required work has been constructed by Consagra Coal Mining Company, the Water and Power Resources Board has no further interest in the matter, except to provide for future maintenance, and it asks us in this proceeding to grant a mandatory injunction imposing the duty of maintaining the structure upon Consagra Coal Mining Company or Ace Coal Company, or both, as their interests may appear. The chancellor can see no justification in the Act of 1913 as amended to impose any such order. As pointed out in this discussion the only authority the board has is to order the owner of an obstruction to repair, alter, change the structure or location, or remove it. When and if the board can legally find that either of these parties own a structure which becomes a water obstruction, it may direct appropriate action under the act. There is no authority in the act to provide against a future situation which may never occur.

### Conclusions of Law

1. The Water and Power Resources Board is without authority to compel Consagra Coal Mining Company to erect a structure in Hull's Creek for the purpose of preventing future accumulations of flood debris from becoming a water obstruction.

2. There is no evidence in the case that from and after July 1, 1947, Consagra Coal Mining Company created, erected or constructed in Hull's Creek a water obstruction within the meaning of the Act of June 25, 1913, P. L. 555, as amended by the Act of May 6, 1937, P. L. 559, 32 PS §681.

3. There is no evidence in the case that Ace Coal Company at any time after October 31, 1947, created, erected or constructed in Hull's Creek a water obstruction within the meaning of the acts of assembly, supra.

4. Since the Consagra Coal Mining Company was under no legal obligation to erect a structure in Hull's

Creek to provide against the possibility of the creation of a water obstruction by accumulation of flood debris, its compliance with the amended order of the board, dated December 18, 1947, was a voluntary act.

5. The voluntary act of Consagra Coal Mining Company in constructing a settling basin in Hull's Creek imposes no liability on Ace Coal Company to contribute to the cost of such construction by reason of any covenant in the deed from Consagra Coal Mining Company to Ace Coal Company, dated October 31, 1947.

6. Neither on October 31, 1947, nor at any time thereafter was Ace Coal Company under any express agreement to contribute to Consagra Coal Mining Company any part of the cost of constructing the settling basin in Hull's Creek.

7. Since Ace Coal Company was under no duty to erect any structure in Hull's Creek to prevent the possible creation of a water obstruction by eroded flood debris, the construction of the settling basin on land of Ace Coal Company by Consagra Coal Mining Company does not entitle Consagra Coal Mining Company to indemnity from Ace Coal Company through any principle of restitution.

8. There is no evidence that Ace Coal Company is unjustly enriched by the construction of the settling basin on its land, and Consagra Coal Mining Company is not entitled to any contribution for the cost of construction by reason of any theory of unjust enrichment.

9. The Water and Power Resources Board has no authority to impose an order on riparian owners for the future maintenance of a structure in a stream channel, which it had no right to order constructed in the first place.

10. A court of equity cannot enforce by injunction an ultra vires order of an administrative agency.

11. The bill should be dismissed as to all defendants.

*Decree Nisi*

Now, December 5, 1949, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows:

1. The bill is dismissed as to Consagra Coal Mining Company.

2. The bill is dismissed as to Ace Coal Company, additional defendant, at the cost of Consagra Coal Mining Company, defendant.

The prothonotary is directed to give notice of the filing of this adjudication, exceptions to be filed sec. reg.